UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

──────────────────────────────────

KEVIN RENARD WILSON,

                        Plaintiff,      **No. 6:15-cv-06377(MAT)**
                                     **DECISION AND ORDER**

        -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                        Defendant.

──────────────────────────────────

### INTRODUCTION

Represented by counsel, Kevin Renard Wilson ("Plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

### PROCEDURAL STATUS

On May 18, 2012, Plaintiff protectively filed applications for DIB and SSI, alleging disability beginning on June 9, 2011. After the applications were denied on July 25, 2012, Plaintiff requested a hearing, which was held on January 28, 2014, before Administrative Law Judge John P. Costello ("the ALJ"). Plaintiff appeared with his attorney and testified, as did impartial

-1-

vocational expert Peter Manzi ("the VE"). T.36-75.[1] The ALJ issued an unfavorable decision on March 14, 2014. T.10-22. On April 27, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely commenced this action.

The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In connection with their motions, the parties have summarized the administrative transcript in their briefs, and the Court adopts and incorporates these factual summaries by reference. The record evidence will be discussed in further detail below, as necessary to the resolution of the parties' contentions.

For the reasons discussed below, the Commissioner's decision is reversed, and the matter is remanded for the calculation and payment of benefits.

## THE ALJ'S DECISION

At step one of the five-step sequential evaluation, the ALJ found that Plaintiff meets the insured status requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity since June 9, 2011. Plaintiff had worked from February 12, 2012, to April 13, 2012, at St. Mary's Hospital as a care assistant. He did not miss any work but reportedly had chest

---

[1]

Citations to "T." refer to pages from the certified transcript of the administrative record, submitted by the Commissioner in connection with her answer to the complaint.

pain and back pain in April, which caused him to see emergency room attention. He was unable to return to work due to back pain.

At step two, the ALJ found that Plaintiff has the following "severe" impairments: spinal stenosis, neck and low back sprain, partial meniscectomy, "tight knee", adjustment disorder, and post-traumatic stress disorder ("PTSD").

At the third step, the ALJ determined that none of Plaintiff's impairments, considered singly or in combination, meets or medically equals a listed impairment. The ALJ gave particular consideration to Listings 1.02 (Dysfunction of a major joint), 1.04 (Disorders of the spine), and 12.04 (Affective disorders). In the domains of functioning pertinent to mental impairments, the ALJ found that Plaintiff has a mild restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and had not experienced any episodes of decompensation.

The ALJ proceeded to assess Plaintiff as having the residual functional capacity ("RFC") to perform light work, except that he is able to "occasionally" climb stairs, ladders, ropes, and scaffolds; "occasionally" balance, kneel, crouch, and crawl; and is limited to "simple tasks."

At step four, the ALJ stated that Plaintiff was a "younger individual" on the alleged disability onset date with at least a high school education. He did not have any past relevant work.

At the fifth step, the ALJ relied on the VE's testimony to find that, given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform, including such representative occupations as laundry sorter (light exertion, SVP of 2) and photocopy operator (light exertion, SVP of 2). Accordingly, the ALJ entered a finding of not disabled.

## SCOPE OF REVIEW

When considering a claimant's challenge to the Commissioner's decision denying benefits under the Act, a district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)). "Failure to apply the correct legal standards is grounds for reversal." Townley, 748 F.2d at 112; see also, e.g., Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) ("The scope of review of a disability determination

. . . involves two levels of inquiry. . . . We must first decide whether [the Commissioner] applied the correct legal principles in making the determination. We must then decide whether the determination is supported by 'substantial evidence.'") (internal citations omitted; quotation omitted).

## DISCUSSION

## I.   Errors in Weighing Opinions by Plaintiff's Treating Physicians

Plaintiff argues that the ALJ erroneously discounted the two opinions offered by primary care physician Dr. Lisa Harris, and the opinion provided by treating psychologist Dr. Lauren DeCaporale-Ryan. See T.18-19.

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician[.]" Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal and other citations omitted). A corollary to the treating physician rule is the so-called "good reasons rule," which is based on the regulations specifying that "the Commissioner 'will always give good reasons'" for the weight given to a treating source opinion. Halloran, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2); citing 20 C.F.R. § 416.927(d)(2); citation omitted). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" Blakely v. Commissioner of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). The "good reasons"

rule exists to "ensur[e] that each denied claimant receives fair process[.]" <u>Rogers v. Commissioner of Social Sec.</u>, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based on the record[,]'" <u>Blakely</u>, 581 F.3d at 407 (quotation omitted; emphasis in original).

Where an ALJ elects not to accord controlling weight to a treating physician's opinion, he "must consider various 'factors' to determine how much weight to give to the opinion[,]" <u>Halloran</u>, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)), such as "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" <u>Id.</u> (quoting 20 C.F.R. § 404.1527(d)(2)).

The Court turns first to the mental RFC questionnaire completed by treating psychologist Dr. DeCaporale-Ryan on December 31, 2013. <u>See</u> T.563-65. Dr. DeCaporale-Ryan indicated she had treated Plaintiff once per week since October 30, 2013. His

diagnoses were PTSD and adjustment disorder with depressed mood, with a rule-out diagnosis of panic disorder. Dr. DeCaporale-Ryan opined that due to his impairments, Plaintiff was precluded from carrying out detailed instructions and traveling to unfamiliar places or using public transportation, and was unable to do the following activities for more than 20 percent of an 8-hour workday: carry out detailed instructions, maintain regular attendance, work in coordination with or proximity to others without being unduly distracted, complete a normal workweek without interruptions from psychologically based symptom, and perform at a consistent pace. T.564. Dr. DeCaporale-Ryan opined that, from 11 percent to 20 percent of an 8-hour workday, Plaintiff would be precluded from carrying out detailed instructions, interacting appropriately with the general public, and responding appropriately to changes in a routine work setting. T.564. She stated that Plaintiff's pain significantly interfered with his ability to maintain activity, engage in social interaction, and monitor his emotional response/distress during interaction with others. Dr. DeCaporale-Ryan opined that Plaintiff would be off task due to his physical and mental limitations for 30 percent of an 8-hour day, and would likely miss more than 4 days per month of work. T.565. Dr. DeCaporale-Ryan noted that Plaintiff wished to return to work, but "pain and subsequent mood lability hinder that at this time." Id.

The Second Circuit has "indicated that when a medical opinion stands uncontradicted, '[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome' it." Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009) (unpublished opn.) (quoting Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation marks omitted; brackets in original; other citations omitted). As Plaintiff points out, the ALJ did not require him to undergo a consultative psychiatric examination. Thus, Dr. DeCaporale-Ryan, provided the sole medical expert opinion in the record regarding the nature and extent of the limitations caused by Plaintiff's mental impairments.

The ALJ, however, accorded Dr. DeCaporale-Ryan's uncontradicted mental RFC assessment only "little weight," T.19, because she had treated Plaintiff "for a few sessions. . . and there [was] little interaction for [the doctor] to rely on when completing the report." T.19. The ALJ's characterization of Plaintiff's treating relationship with Dr. DeCaporale-Ryan was not accurate and does not correctly apply the law. Under the Regulations, a treating source is afforded greater weight once he has examined the claimant "'a number of times and long enough to have obtained a longitudinal picture of [the alleged] impairment.'" 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). "Importantly, there is *no arbitrary, minimum period* of treatment by a physician

-8-

before this standard is considered met." <u>Fratello v. Colvin</u>, No. 13-CV-4339 VSB JLC, 2014 WL 4207590, at *11 (S.D.N.Y. Aug. 20, 2014), <u>rep. and rec. adopted sub nom. Fratello v. Comm'r of Soc. Sec.</u>, No. 13-CV-4339 VSB JLC, 2014 WL 5091949 (S.D.N.Y. Oct. 9, 2014) (emphasis supplied; citing <u>Schisler v. Bowen</u>, 851 F.2d 43, 45 (2d Cir. 1988) ("SSA adjudicators [should] focus on the nature of the ongoing physician-treatment relationship, rather than its length."); <u>Simmons v. U.S. R.R. Ret. Bd.</u>, 982 F.2d 49, 55 (2d Cir. 1992) ("The *nature*—not the length—of the [physician-patient] relationship is controlling.") (emphasis in original); <u>Vargas v. Sullivan</u>, 898 F.2d 293, 294 (2d Cir. 1990) (applying treating physician rule where doctor saw patient for only 3 months)). While Plaintiff did not begin treatment until the end of 2013 with Dr. DeCaporale-Ryan, he attended 7 in-depth psychotherapy sessions with her during October, November, and December of that year, the substance of which are set forth in her detailed treatment notes. <u>See</u> T.567-88. By the time she issued her mental RFC assessment, Dr. DeCaporale-Ryan had a sufficient therapeutic relationship with Plaintiff to warrant giving her opinion significant, if not controlling, weight. <u>See</u> <u>Fratello</u>, No. 13-CV-4339 VSB JLC, 2014 WL 4207590, at *11 (finding that doctor was a "treating physician" where, "[b]y the time of the ALJ hearing, [Dr.] Quittman had seen Fratello ten times between March and October 2011. While the record contains relatively few pages of notes from [Dr.] Quittman—at least

-9-

in comparison with those from Summit or Good Samaritan—he evidently had enough of a treatment relationship with, and professional opinion of, Fratello to complete a four-page mental health function questionnaire").

The ALJ next determined that he could not credit two limitations placed on Plaintiff by Dr. DeCaporale-Ryan regarding the number of days of work he would miss, and the percentage of time he would be off-task during the workday because they were allegedly based on "speculation." T.19. The ALJ did not explain why he believed these limitations were based on "speculation," and his failure to link this vague assertion to any evidence in the record precludes meaningful appellate review. The Court finds that the allegedly "speculative" nature of Dr. DeCaporale-Ryan's professional opinion, based on her established treating relationship and face-to-face interactions with Plaintiff, is not a "good reason".

The ALJ then dismissed, without "good reasons," the balance of Dr. DeCaporale-Ryan's opinion, which contained other significant limitations regarding Plaintiff's work-related functioning, including his ability to maintain regular attendance, concentrate for 2-hour segments of time, complete a normal workday or workweek without interruptions from psychologically-based symptoms, and work at a consistent pace without an unreasonable number and length of rest periods. According to the ALJ, Plaintiff enjoyed "mentally

stimulating puzzles," which established that he could not have "significantly impaired concentration or persistence," T.20, contrary to Dr. DeCaporale-Ryan's opinion. While Plaintiff did testify that he used Sudoku or word puzzles to try to get his mind off his pain, T.59, he qualified this by stating he could only focus on doing a puzzle for about 10 to 15 minutes before he became frustrated by his pain. Id.; see also T.60 ("If I'm doing a book, I can finish one puzzle and go on to the next puzzle but my body starts hurting [and] I get so frustrated that I just put the book down because I want to be able to finish the puzzle and the pain over the puzzle, the pain always wins."). A reason, such as this, that relies on a mischaracterization of the record cannot be a "good reason." See Lowe v. Colvin, No. 6:15-CV-6077(MAT), 2016 WL 624922, at *5 (W.D.N.Y. Feb. 17, 2016) (In rejecting a treating source's opinion, "the ALJ mischaracterized the substance of [the doctor]'s first Questionnaire, which was improper.") (citing Brennan v. Colvin, No. 13-CV-6338 AJN RLE, 2015 WL 1402204, at *16 (S.D.N.Y. Mar. 25, 2015) ("By unreasonably minimizing Dr. Barandaran's opinion that corroborated Dr. Fauser's opinion, the ALJ mischaracterized evidence in the record. In evaluating the record, the ALJ may not ignore or mischaracterize evidence of a person's alleged disability."); Ericksson v. Comm'r of Soc. Sec., 557 F.3d 79, 82-84 (2d Cir. 2009) ("[T]he record demonstrates that the first ALJ improperly disregarded or mischaracterized evidence

of Erickson's continuing disability, and that the second ALJ awarded Erickson benefits based, in substantial part, on a proper assessment of this very evidence.")). This error was significant since the VE testified that the limitations assigned by Dr. DeCaporale-Ryan (e.g., being off-task or unable to perform required duties for 20 percent of an 8-hour day) were "too much" and would preclude competitive gainful employment. T.74.

The Court turns next to the ALJ's evaluation of the opinions provided by Plaintiff's primary care physician, Dr. Harris. The administrative record contains treatment notes from Dr. Harris summarizing approximately 24 appointments with Plaintiff through October 2013.

Dr. Harris submitted her first medical source statement on March 12, 2013, see T.358-62, indicating that she had treated Plaintiff for 9 years. Plaintiff had been in two motor vehicle accidents in 2010 and 2011, in which he sustained a neck sprain, lumbar sprain, thoracic sprain, and shoulder sprain. Over the course of his treatment with Dr. Harris, he had attempted physical therapy but was discharged due to lack of improvement; had consulted with a neurologist; had been prescribed numerous medications without long-term benefit, including NSAIDs (Mobic/meloxicam, Indocin, Relafen, diclofenac), narcotics (Fentanyl patches, Percocet, Valium, OxyContin), muscle relaxants (Flexural), neuropathic pain medications (Lyrica, gabapentin), and

-12-

others (Medrol DosePak, Cymbalta, Lidoderm patches); and had tried heating pads, a TENS unit, and chiropractic treatment. Plaintiff's chronic back pain was refractory to the many interventions tried. Dr. Harris diagnosed him with chronic pain syndrome, and opined that his prognosis was poor. Dr. Harris noted that various emotional factors affected Plaintiff's physical condition, including depression. She stated that his pain would constantly be severe enough to interfere with his ability to maintain attention and concentration. Dr. Harris opined that Plaintiff could not walk any city blocks without pain, could sit for 15 minutes at one time, and could stand for only 5 minutes at one time. He could only sit, stand and walk for less than 2 hours each in an 8-hour day. He needed to walk around during an 8-hour day, but because walking exacerbated his pain, he also needed the opportunity to be supine. T.360. If doing prolonged sitting, he needed to elevate his legs 15 degrees. He could never lift even less than 10 pounds; and could never twist, stoop, bend, crouch, squat, or climb ladders or stairs. He was limited in overhead reaching, and could only reach with his arms 40 percent of the time. Dr. Harris noted that Plaintiff would have good and bad days, and that he would be absent more than 4 days per month due to his impairments or treatment.

Dr. Harris submitted a second medical source statement on May 17, 2013, see T.451-55, again stating that Plaintiff suffered from chronic pain syndrome, and had a poor prognosis. She again opined

that pain would constantly interfere with his ability to maintain
attention and concentration. Dr. Harris remarked that Plaintiff was
eager to work, and "attempted" to do household activities. He could
sit only 15 minutes at one time, and stand for only 10 minutes at
one time. He could sit, stand, and walk for less than 2 each hours
in an 8-hour day. Dr. Harris opined Plaintiff would need periods of
walking in an 8-hour day, every 10 minutes for 10 minutes at a
time. He would need to take unscheduled breaks every hour for 10 to
15 minutes. Again, Dr. Harris stated that Plaintiff could never
lift even less than 10 pounds. His impairments would cause good
days and bad days, and he would miss more than 4 days per month of
work as a result.

The ALJ elected to give "little weight" to Dr. Harris'
opinions because they were allegedly "inconsistent" with "the
record," "belied" by Plaintiff's activities of daily living, and
not supported by objective evidence. T.18. Plaintiff argues that
these do not constitute "good reasons," and that the ALJ committed
a step two error by ignoring Dr. Harris' diagnosis of chronic pain
syndrome. The Court agrees that the ALJ's omission of chronic pain
syndrome at step two was erroneous. See, e.g., Myers v. Colvin, 954
F. Supp. 2d 1163, 1173 (W.D. Wash. 2013) ("The ALJ's finding with
respect to chronic pain syndrome/disorder appears to lack both
medical and legal support. The DSM-IV-TR recognizes three subtypes
of pain disorder: pain disorder associated with psychological

factors (307.80); pain disorder associated with both psychological factors and a general medical condition (307.89); and pain disorder associated with a general medical condition—only the latter of which is not considered a mental disorder and is used to facilitate differential diagnosis. DSM-IV-TR 499 (4th ed. 2000). Thus, contrary to the ALJ's assertion that the DSM-IV-TR establishes that 'Chronic Pain Syndrome is neither a mental disease . . . nor a physical disease,' the DSM-IV-TR shows that two subtypes of pain disorder are recognized mental disorders.") (internal citation to record omitted).[2] Dr. Harris' diagnosis of chronic pain syndrome was corroborated by the treatment notes from behavioral pain psychologist behavioral pain psychologist Dr. Michael J. Kuttner, who also diagnosed Plaintiff with chronic pain syndrome. Dr. Harris stated that Plaintiff "continues with high levels of pain that are not consistent with the findings or the MRI. The high level of pain exceeds what would be expected. He has symptoms that are more consistent with a chronic pain syndrome from the trauma of the accident." T.471; see also T.479 (Dr. Harris stated that Plaintiff "has developed chronic pain due to multilevel stenosis . . . .").

---

[2]

 The U.S. Department of Veterans Affairs recognizes "chronic pain syndrome" as distinct from chronic pain. See http://www.va.gov/PAINMANAGEMENT/Chronic_Pain_Primer.asp ("In deciding how to treat chronic pain, it is important to distinguish between CHRONIC PAIN and a CHRONIC PAIN SYNDROME. A chronic pain syndrome differs from chronic pain in that people with a chronic pain syndrome, over time, develop a number of related life problems beyond the sensation of pain itself. . . . [Individuals] who do develop chronic pain syndromes tend to experience increasing physical, emotional, and social deterioration over time. . . .") (last accessed Sept. 29, 2016).

Similarly, Dr. Kuttner indicated that Plaintiff fell into a dysfunctional profile of chronic pain patients, making him highly sensitive to his pain, beyond what one might expect based on his anatomic or physiologic presentation. T.438. Dr. Kuttner observed that Plaintiff was "so significantly more depressed [when compared to chronic pain patients in general] as to interfere with rehabilitative attempts." Id. Dr. Kuttner also identified that Plaintiff's use of distraction (e.g., doing puzzles) was "generally an unsuccessful strategy for chronic pain." T.438. Dr. Kuttner explained that Plaintiff was "having a difficult time in managing his MVA-related injury loss of functional capacity and endurance[,]" id., and was responding to the loss of functional capacity, enduring pain, and suffering with an increase in anxiety and depression, T.439, which in turn was increasing pain levels and decreasing tolerance of pain, thereby reducing perseverance when he attempted activities that might increase pain (e.g., rehabilitative efforts). Id. As Plaintiff argues, he was diagnosed with chronic pain syndrome *because* he was experiencing chronic, intractable pain that was inconsistent with the objective medical findings, such as the MRIs. However, the Court need not determine whether the ALJ's step-two error was harmful, standing alone, because the effects of it were subsumed by the ALJ's other errors in weighing Dr. Harris' RFC assessments, as discussed further below.

The ALJ's assertion that Dr. Harris' opinions were "wholly

inconsistent with the entire record," T.18, is simply not accurate given that Plaintiff reported pain to every treatment provider during the relevant period. Dr. Harris consistently identified Plaintiff as being in distress and experiencing pain of varying levels of severity. During a number of visits, she described him as "nearly immobile" due to lower back pain. T.463, 465, 469, 467, 471. Dr. Harris noted on multiple occasions that he was moving slowly or sitting uncomfortably due to pain. T.481, 483, 487, 491, 495, 497, 500, 504, 505, 510, 512. Other medical providers made similar observations. Primary care physician Dr. Holub stated that Plaintiff's back pain was "poorly controlled." T.547. Neurologist Dr. Mary Dombovy observed that straight-leg raise testing was positive bilaterally, and Plaintiff moved "very slowly." On multiple occasions, Plaintiff had reduced range of motion, reduced strength, tenderness, and spasms in his back. T.457, 369, 461, 314, 314, 467, 471, 288, 306, 344, 334, 497, 512. The Court is unable to discern what  evidence (apart from the "modest" MRI findings)  the ALJ found to be contradictory to Dr. Harris' opinions, because the ALJ concluded without explanation that Dr. Harris' opinions were "wholly inconsistent with the entire record." T.18. This does not constitute a "good reason" to reject a treating source opinion. See, e.g., Marthe v. Colvin, No. 6:15-CV-06436(MAT), 2016 WL 3514126, at *7 (W.D.N.Y. June 28, 2016) ("The ALJ did not point to any other evidence to support his contention that Dr. Drinkwater's

opinion was 'somewhat' inconsistent with his treatment notes.  By failing to identify the alleged inconsistencies between Dr. Drinkwater's RFC questionnaire and the 7 years of treatment notes, the ALJ has failed to provide any basis for rejecting Dr. Drinkwater's opinion, much less the requisite 'good reasons' based on substantial evidence.") (citing Ely v. Colvin, No. 14-CV-6641P, 2016 WL 315980, at *4 (W.D.N.Y. Jan. 27, 2016) ("The ALJ does not identify anything in the record, other than the GAF scores, discussed below, that is inconsistent with [the treating doctor]'s opinions. Without identifying the alleged inconsistencies in the record, the ALJ has failed to provide any basis for rejecting [those] opinions."); other citation omitted).

Finally, the ALJ asserted that Dr. Harris' opinion was "belied" by Plaintiff's activities of daily living. Again, this does not represent a "good reason" to reject Dr. Harris' opinion. Courts in this Circuit repeatedly have recognized that "'[a] claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job.'" Harris v. Colvin, 149 F. Supp.3d 435, 445-46 (W.D.N.Y. 2016) (quoting Polidoro v. Apfel, No. 98 CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. 1999) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) (finding

that Secretary failed to sustain burden of showing that claimant could perform sedentary work on the basis of (1) testimony that he sometimes reads, watches television, listens to the radio, rides buses and subways, and (2) ALJ's observation that claimant "'sat still for the duration of the hearing and was in no evident pain or distress'"; "[t]here was no proof that [claimant] engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job")).

The ALJ asserted that certain mundane activities, such as helping with childcare and housework, undermined Dr. Harris' opinion. However, Dr. Harris was aware that Plaintiff attempted to do housework, as she stated that he was "eager to work and attempt to do household activities." T.452. Thus, a reasonable reading of Dr. Harris' opinion is that she took these activities into account and still opined that he could not do the sitting, standing, and walking required by the definition of sedentary work.

## II.  **Failure to Weigh a Treating Physician's Opinion**

Plaintiff points out that the ALJ did not explicitly mention the opinion offered by treating source Dr. David  Holub. See T.593-96. Plaintiff argues that the ALJ therefore erroneously failed to weigh it, in violation of the Commissioner's regulations that require the administrative decisionmaker to "evaluate every medical opinion [he] receive[s]." 20 C.F.R. §§ 404.1527(c), 416.927(c). In determining a claimant's RFC, the ALJ must consider

all relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

Plaintiff testified he had begun treating with Dr. Holub after his long-time primary care physician, Dr. Harris, left the area. T.61. Plaintiff established care with Dr. Holub in September 2013, and treated with him four times. T.544, 549, 547, 551. Dr. Holub opined that Plaintiff could not stand at all for any length of time, and could only stand and walk for less than 2 hours in an 8-hour day. T.593. Rather than attempting to reconcile Dr. Holub's opinion, which conflicted with his assessment that Plaintiff can perform light work (which requires 6 hours of standing and walking in a workday), the ALJ apparently simply ignored it. Additionally, Dr. Holub opined that Plaintiff could sit, stand and walk for 6 hours out of an 8-hour day. T.593. When such a limitation was presented to the VE, he testified that if an individual were limited to sitting, standing, and walking for a total of 6 hours out of an 8-hour day, it would preclude gainful employment. T.74. Therefore, the ALJ's failure to evaluate Dr. Holub's opinion was not harmless because, if the opinion were credited, it would have directed a finding of disability. Furthermore, Dr. Holub likely would have qualified as a treating physician, and his opinion would have been entitled to treating-physician deference. See, e.g., Fratello, 2014 WL 4207590, at *11 (citing Schisler, 851 F.2d at 45; Vargas, 898 F.2d at 294 (applying treating physician rule where

doctor saw patient for only 3 months)).

### III. Erroneous Credibility Assessment

Plaintiff also that the ALJ did not give proper consideration to his allegations of pain and side effects, and erroneously found him not credible.

In assessing a claimant's subjective complaints of pain, the ALJ first must determine whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the pain alleged. 20 C.F.R. §§ 404.1529(b), 416.929(b). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Meadors v. Astrue, 370 F. App'x 179, 183-84 (2d Cir. 2010) (unpublished opn.) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); footnote omitted). When finding a claimant not entirely credible, the ALJ must include in his decision "specific reasons for the finding on credibility, supported by the evidence in the case record . . . ." ; see also ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996).

Here, the ALJ found that although Plaintiff had medically determinable impairments that reasonably could be expected to

produce the alleged symptoms, and "[a]lthough [he] continues to experience some limitations from his impairments, there is no credible evidence to show that they prevent him from performing basic work activities."   As discussed further below, the ALJ's analysis is marred by numerous, substantial factual errors, and unsupported reasoning.

First, the ALJ asserted, Plaintiff "has described daily activities, which are not limited to the extent one would expect" since he, on one occasion, told the "consultative internist that he is able to cook, clean, do laundry, go shopping, perform personal hygiene, travel to appointments, and interact with his girlfriend and three-year-old daughter." T.20. Courts in this Circuit have definitively and uniformly rejected the discounting of a claimant's credibility based on the ability to perform such mundane activities. See, e.g., Doyle v. Apfel, 105 F. Supp.2d 115, 120 (E.D.N.Y. 2000) ("The activities of daily living that he relied upon, such as reading, watching TV, doing light household work, going out to dinner periodically, and taking occasional trips, are not indicative of an ability to satisfactorily perform a job, much less plaintiff's previous job as a personnel manager.") (citing Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1998); Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); see also, e.g., Moss v. Colvin, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("There are

critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job."); other citations omitted); <u>Scannapieco v. Chater</u>, No. CIV. A. 94-1891, 1995 WL 613096, at *4 (E.D. Pa. Oct. 18, 1995) (claimant testified that she attended AA meetings twice a week and was able to take care of her personal hygiene; ALJ concluded that "[b]oth of these activities indicate[d] a residual functional capacity for at least sedentary work"; district court found that "[n]either [claimant]'s attendance at AA meetings nor her ability to maintain her personal hygiene constitute[d] 'substantial evidence' of residual capacity to perform specific jobs existing in the national or regional economies") (citation omitted).

The ALJ also stated that Plaintiff was "apparently able to care for young children [sic] at home, which can be quite demanding both physically and emotionally, without any particular assistance." T.20. This assertion misstates the record insofar as Plaintiff only has *one* child, and there is no evidence in the record that he ever cared for multiple children. Furthermore, it "fails to recognize differences between being a parent, caring for one's children at home, and performing substantial gainful employment in the competitive workplace on a 'regular and continuing basis,' i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule[.]'" <u>Harris v. Colvin</u>, 149 F. Supp. 3d 435, 444 (W.D.N.Y. 2016) (citing <u>Gentle v. Barnhart</u>, 430 F.3d 865,

868 (7th Cir. 2005) ("A more important point is that taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not."); other citations omitted).

The ALJ also asserted that Plaintiff was not credible because he had "not undergone any formal physical therapy or other pain relieving treatment." T.20. This statement is inaccurate. Plaintiff underwent a physical therapy evaluation for his back pain on July 12, 2011, with Jessica Nonkes MS, PT. T.369. Plaintiff reported severe neck and low back pain, radiating to above the knee. Plaintiff had five physical therapy appointments in July of 2011, and eight such appointments in August of 2011. T.371-75. On August 8, 2011, it was noted that Plaintiff had minimal change in his back pain and function, but he reported decreased radiation of pain. The discharge note dated August 25, 2011, stated that despite his compliance with therapy, Plaintiff had no significant change in his neck and back pain. T.376. He was discharged from physical therapy for lack of improvement. Id. He again attended physical therapy after his right-knee arthroscopy, from July 26, 2013, to August 14, 2013. T.528-33; 535. In addition to physical therapy and medication, Plaintiff tried heating pads, a TENS unit, chiropractic care, massage therapy, and acupuncture. T.551, 545. Plaintiff also sought treatment from a behavioral pain specialist, Dr. Jaimala Thanik, and a behavioral psychologist, Dr. Kuttner, in efforts to address his chronic pain. T.437-40; 567-88.

The ALJ discredited Plaintiff's statements based on the incorrect assertion that he "has not taken any medication" for his "allegedly disabling symptoms." T.20. As noted above, Plaintiff has been prescribed a slew of medications, including NSAIDs (Mobic/meloxicam, Indocin, Relafen, diclofenac), narcotics (Fentanyl patches, Percocet, Valium, OxyContin), muscle relaxants (Flexural), neuropathic pain medications (Lyrica, gabapentin), and others (Medrol DosePak, Cymbalta, Lidoderm patches). Some did not provide any relief at all, and none of them has had lasting or significant benefit.

The ALJ further opined that Plaintiff had "not generally received the type of medical treatment one would expect for a totally disabled individual." T.20. This amounts to the ALJ improperly "playing doctor," by relying on his own lay opinion over the multiple, competent medical opinions before him. See Primes v. Colvin, No. 6:15-CV-06431(MAT), 2016 WL 446521, at *4 (W.D.N.Y. Feb. 5, 2016) ("The ALJ repeated this error [of playing doctor] when he opined that Plaintiff 'has not generally received the type of medical treatment one would expect from a totally disabled individual[.]' The ALJ identified no medical expert who opined that Plaintiff's medical treatment was atypical for a person who is disabled. Thus, the ALJ again improperly relied on his own lay opinion.") (internal citation to record omitted; brackets in original); Andino v. Bowen, 665 F. Supp. 186, 191 (S.D.N.Y. 1987)

("[T]he Secretary may not 'substitute his or her own inferential judgment for a competent medical opinion, particularly where the ALJ's judgment assumes some degree of medical expertise and would amount to rendering an expert medical opinion which is based on competence he or she does not possess.'") (quotation and citation omitted).

Here, although the ALJ provided "'specific' reasons for discounting Plaintiff's credibility, the Court cannot find that they were 'legitimate' reasons because they are based on a misconstruction of the record." Poles v. Colvin, No. 14-CV-06622 MAT, 2015 WL 6024400, at *6 (W.D.N.Y. Oct. 15, 2015). This is an additional basis for reversing the Commissioner's decision. See, e.g., Branca v. Comm'r of Soc. Sec., No. 12-CV-643 JFB, 2013 WL 5274310, at *13 (E.D.N.Y. Sept. 18, 2013) (collecting cases).

## IV.   Remedy

The fourth sentence of Section 405(g) of the Act provides that a "[c]ourt shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . ., with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). Although it is less typical, reversal without remand is the appropriate disposition when the record contains "persuasive proof of disability," Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980), and further proceedings would be of no use because there is no

reason to conclude that additional evidence might support the Commissioner's claim that the claimant is not disabled, <u>Butts v. Barnhart</u>, 388 F.3d 377, 385-86 (2d Cir. 2004).

Here, that standard is met. The ALJ committed multiple errors of law and repeatedly mischaracterized the record when weighing the medical source statements of Plaintiff's treating physician, Dr. Harris, and treating psychologist, Dr. DeCaporale-Ryan. None of the regulatory factors support a decision not to afford controlling weight to these opinions, which are well supported by the evidence of record and consistent with the opinion of primary care physician Dr. Holub, who took over Plaintiff's care when Dr. Harris left the area, and whose report the ALJ did not evaluate at all. Furthermore, the ALJ's assessment of Plaintiff's credibility was based on numerous mischaracterizations of the record and misapplications of the law. If Dr. Harris' and Dr. DeCaporale-Ryan's opinions were given controlling weight, and Plaintiff's testimony were credited, the VE's testimony establishes that Plaintiff would be unable to maintain competitive gainful employment. <u>See</u> <u>Beck v. Colvin</u>, No. 6:13-CV-6014(MAT), 2014 WL 1837611, at *15 (W.D.N.Y. May 8, 2014) ("Substantial evidence exists in the record to warrant giving deference to the opinions of Plaintiff's treating psychiatrist, and when that deference is accorded, a finding of disability is compelled.") (citing <u>Spielberg v. Barnhart</u>, 367 F. Supp.2d 276, 283 (E.D.N.Y. 2005) ("[H]ad the

ALJ given more weight to the treating sources, he would have found plaintiff disabled. . . .")). In the present case, the record is complete, and further administrative proceedings would serve no purpose. Accordingly, remand for the calculation of benefits is warranted. See Parker, 626 F.2d at 235.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted. The Commissioner's decision is reversed, and the matter is remanded solely for the calculation and payment of benefits. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**S/ Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     October 3, 2016
           Rochester, New York